**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Brett MUMFORD, Robert Springfield,
and Christopher Springfield,
Defendants–Appellants.**

Nos. 93–2612, 93–2642 and 93–2768.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 7, 1994.

Decided May 24, 1994.

462

Christopher T. Van Wagner, Office of U.S. Atty., Madison, WI (argued) for U.S.

David L. Mandell (argued), Rick B. Meier, Mandell & Ginsberg, Madison, WI, for Brett Mumford.

James P. Brennan, Quarles & Brady, Milwaukee, WI (argued), for Robert Springfield.

Robert Glickman, Madison, WI (argued), for Christopher Springfield.

Before CUDAHY and COFFEY, Circuit Judges, and NORGLE, District Judge.*

NORGLE, District Judge.

Brett Mumford, Robert Springfield, and Christopher Springfield each entered pleas of guilty to possession of cocaine with intent to distribute and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The district court imposed sizable prison terms and they now appeal from those sentences. We affirm.

## I.

The three defendants were charged in a five-count indictment. Count I charged the defendants, together with a co-defendant, Graham Boorse, with conspiracy to possess and distribute cocaine between December 1, 1991 and October 26, 1992. Counts II, III, IV, and V charged Christopher additionally with four substantive counts of distribution of cocaine for transactions occurring on March 7, March 10, March 25, and August 15, 1992, respectively. Robert was charged with cocaine distribution along with Christopher under counts II and III, and Mumford was charged with Christopher under count IV.

The defendants' arrests were the result of a series of controlled purchases of cocaine by the government through an informant. The investigation began when David Dettman was stopped by police in February 1992 while he was headed to Milwaukee to pick up cocaine from Robert. Dettman was apprehended after police found him in possession of over $1,000 in cash, a shotgun, and drug paraphernalia containing cocaine residue.

---

* Honorable Charles R. Norgle, Sr., of the Northern District of Illinois, Eastern Division, is sitting by designation.

Dettman agreed to become the government's confidential informant and to cooperate with authorities to purchase cocaine from his co-conspirators. As part of his cooperation, Dettman audio taped numerous phone conversations with Christopher, Robert, and Mumford in which they discussed cocaine purchases. Subsequently, Dettman purchased cocaine from the defendants through separate transactions on March 7, March 10, March 25, and August 15, 1992.

According to the presentence investigation reports and the evidence adduced during the sentencing hearing, the origin of the defendants' trafficking scheme began with Mumford's and Christopher's acquaintance. On occasion Mumford would purchase user quantities of cocaine from Christopher in Wausau, Wisconsin. After Christopher told Mumford that he obtained the cocaine from his brother, Robert, in Milwaukee, the two began making periodic trips to Milwaukee in order to obtain cocaine for Mumford, usually in ounce quantities.

Christopher accompanied Mumford to Milwaukee on an estimated eighteen to twenty-four drug buys. Mumford also met with Robert alone a number of times to purchase cocaine. On his own estimate, Mumford made more than one hundred trips to Milwaukee to pick up cocaine from Robert in the six-month period between December 1991 and May 1992. These trips usually scored at least one ounce of cocaine, and quite often more.

The roots of the scheme expanded as other individuals started to participate in Mumford's excursions to Milwaukee. Dettman, who later became the government's informant, began accompanying Mumford on some trips to Milwaukee and reported that another individual, Thomas Heisler, was a partner in the drug activities who also accompanied Mumford to Milwaukee on several drug buys. Boorse stated that he also travelled with Mumford on at least six occasions to get cocaine from Robert.

But the drug activities were not limited to purchases of cocaine in Milwaukee. Co-defendant Boorse reported that in December 1991 Dettman and Mumford had informed him that they were involved in a "cocaine partnership" in which they would go to Milwaukee and pool their money to purchase cocaine for resale in the Wausau area. Boorse further recounted that Mumford dealt cocaine regularly out of the basement of his liquor store in Wausau. Boorse heard Mumford and Dettman discuss two-ounce cocaine deals at $900 per ounce, and stated that Mumford sometimes dealt cocaine from Boorse's residence. According to the presentence reports, Robert sometimes travelled to Wausau to deliver cocaine so Mumford could sell it out of his liquor store. Boorse claims to have witnessed Mumford selling cocaine on as many as one hundred separate occasions. Dettman also reported that he, Mumford, and Heisler were bringing one quarter of a pound of cocaine into the Wausau area per week.

The district court conducted a joint sentencing hearing on June 24, 1993. During the five-hour hearing, the government called one witness, Sergeant Thomas Kujawa. Kujawa, an officer assigned to a special investigations unit, summarized the evidence he had gathered concerning the drug quantities at issue. The district court allowed two hours of cross-examination of Kujawa. The defendants exercised their right to remain silent. Mumford's mother, however, testified as to Mumford's personal drug use. The district judge made her factual determinations from the presentence reports prepared by the probation office and the evidence adduced during the sentencing hearing. The probation office's presentence reports, in turn, were prepared from Kujawa's case reports, including the debriefing of the cooperating informant, Dettman, as well as the post-arrest and debriefing statements by Mumford, Robert, and others.

The district court found that between 500 grams to 2 kilograms of cocaine was involved in the narcotics distribution scheme of the defendants and attributed that amount to each defendant. After making various other adjustments under the Sentencing Guidelines, the district court sentenced Mumford to 110 months imprisonment, Christopher to 120 months imprisonment, and Robert to 61 months imprisonment.

## II.

The standard of review in this case is well understood. The government must prove the sentencing factors under the Guidelines by a preponderance of the evidence. *United States v. Cotts,* 14 F.3d 300, 305 (7th Cir. 1994); *United States v. Hamm,* 13 F.3d 1126, 1129 (7th Cir.1994). The factual findings of the district court will not be overturned unless they are clearly erroneous, while the interpretation of the Sentencing Guidelines is subject to *de novo* review. *United States v. Lozoya–Morales,* 931 F.2d 1216, 1218 (7th Cir.1991). Thus, we will reverse the district court's conclusion as to the quantity of cocaine attributed to the defendants only if we have a definite and firm conviction that the district court made a clear mistake in sentencing. *United States v. Rivera,* 6 F.3d 431, 444 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994); *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195, — U.S. ——, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993). The district court is to base its determinations upon the evidence in the record and upon its own credibility evaluations. *Cotts,* 14 F.3d at 305. These credibility determinations will be given utmost deference. *Hamm,* 13 F.3d at 1129–30; *United States v. Cherry,* 938 F.2d 748, 758 (7th Cir.1991).

## III.

### *Brett Mumford's Appeal.*

Mumford pleaded guilty to count IV of the indictment charging him with possession of cocaine with intent to distribute for his involvement in a March 25, 1993 transaction between himself and Dettman. Mumford challenges the district court's finding that the amount of cocaine attributable to him for purposes of sentencing was more than 500 grams but less than 2 kilograms.

■ A defendant's base offense level for a narcotics offense is defined primarily by the amount of drugs attributable to him or her. *See* U.S.S.G. § 2D1.1. In calculating a defendant's base offense level, a district court must consider not only the acts engaged in during the offense of conviction, but must also consider the defendant's "relevant conduct." *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). It is axiomatic that conduct relevant for purposes of a narcotics offense includes "'all such acts and omissions [of the defendant] that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Thomas,* 969 F.2d 352, 355 (7th Cir.) (quoting U.S.S.G. § 1B1.3(a)(2) (incorporating by reference U.S.S.G. § 3D1.2(d))), *cert. denied,* — U.S. ——, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992). The district court must consider this relevant conduct when calculating a base offense level even if the defendant was never charged or convicted of these other acts. *Id.* at 355.

■ Moreover, in some circumstances relevant conduct includes the conduct of others for which a defendant is legally accountable. *Rivera,* 6 F.3d at 445; *United States v. Flores,* 5 F.3d 1070, 1082 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994). Thus, in a narcotics offense, where § 3D1.2(d) would require grouping of multiple counts, all the reasonably foreseeable acts of others committed in furtherance of the joint criminal plan or scheme that was "part of the same course of conduct or common scheme or plan as the offense of conviction" becomes relevant to the base offense level. U.S.S.G. §§ 1B1.3(a)(1)(A), (B) & (a)(2); *see also Cotts,* 14 F.3d at 305 (conspirators are responsible for amounts of narcotics actually distributed as well as the amount involved in reasonably foreseeable transactions). Thus, district courts may correctly aggregate all the quantities of drugs involved in an entire, basic scheme of multiple defendants when it determines an individual defendant's base offense level.

■ Mumford's primary argument is that the evidence adduced at the sentencing hearing only establishes that he is a cocaine user, and thus there is no reliable evidence linking him to the distribution of large quantities of cocaine. He argues that, even though he admitted to purchasing, in total, approxi-

mately 2.5 kilograms of cocaine, this was for personal use—he was using an ounce (approximately 28 grams) of cocaine about every two or three days. Because Mumford's purchases of cocaine for personal consumption constitute simple possession under 21 U.S.C. § 844 and not distribution under 21 U.S.C. § 841(a)(1), he argues those purchases are not part of the same course of conduct as the offense of conviction and thus cannot be considered as relevant conduct for purposes of sentencing. Mumford therefore argues that he can only be sentenced on the smaller amounts he intended to distribute.

Nonetheless, there exists sufficient evidence to sustain the district court's finding that more than 500 grams of cocaine was attributable to Mumford. There is sufficient evidence linking Mumford to the conspiracy to distribute cocaine. Kujawa based his testimony during the sentencing hearing on his investigation and the interviews of other co-conspirators, including Heisler, Boorse, Dettman, and Robert, and on statements made by Mumford himself. On direct examination, Kujawa first estimated that Mumford delivered 750 to 1000 grams of cocaine. The evidence also demonstrated that Mumford purchased approximately $60,000 worth of cocaine. Although Mumford consumed a great portion of the cocaine, Kujawa estimated that Mumford cut the rest for distribution. On the single occasion when police obtained cocaine from Mumford, Mumford had purchased one ounce in Milwaukee, consumed half, and delivered the remaining to Dettman, *albeit* uncut. On cross examination, Kujawa placed between 20 and 250 grams as a minimum directly in Mumford's hands as specific corroborated sales based upon statements he obtained from other co-conspirators. The presentence report noted that the cocaine Dettman purchased from Mumford on March 25th weighed about fifteen grams. Kujawa acknowledged Mumford's personal cocaine use, but estimated that Mumford had distributed or assisted in the distribution of cocaine during the history of the scheme. Mumford himself admitted to between sixty to one hundred trips to Milwaukee to purchase cocaine. Mumford often brought along other drug users and sellers to share in the cocaine supplied by Robert.

According to Boorse's statement to Kujawa, Dettman had admitted that he and Mumford were in the business of purchasing cocaine for resale in the Wausau area. Also according to Kujawa, Dettman acknowledged four sales of cocaine between Mumford and himself. Boorse related that Mumford sold cocaine from the basement of his liquor store during the months of the conspiracy. Boorse reports of nearly one hundred sales of cocaine from Mumford's liquor store. Mumford also had a financial motive for reselling part of the cocaine he purchased: to get enough money to support his serious drug addiction without further depleting the assets of his jointly-owned liquor store.

The district court discounted some of Mumford's statements. The court found that sixty trips was a more reasonable estimate of the number of trips Mumford took to Milwaukee. But even with that conservative estimate, the district court correctly noted that if Mumford picked up only an ounce of cocaine on those trips, that sixty ounces of cocaine would remain attributable to Mumford personally. Also, if only one-half of that was sold, then well over 500 grams of cocaine was attributable to Mumford for non-personal use. These findings are not clearly erroneous.

■ Mumford further argues that the district court's findings as to whether he cut the cocaine for resale and as to the amount of cocaine he used versus that which he sold are all based upon Kujawa's speculation. Mumford asserts that the district court incorrectly based its decision on Kujawa's estimation which, in turn, was based solely on his past experience with heavy drug users in general and on unsubstantiated conjecture. Also, Mumford attacks the credibility of the co-defendants and the informant for purposes of the information used to establish Mumford's involvement in the narcotics conspiracy. Specifically, Mumford claims Boorse, who supplied information to Kujawa, is inherently unreliable because he is a cocaine addict and a pusher. Mumford also notes in his brief that he had withdrawn his earlier plea on the government's invitation because the govern-

ment had determined that its confidential informant was untrustworthy.

■■■ A defendant is entitled to be sentenced by accurate information; in other words, evidence evincing a sufficient amount of reliability to support its probable accuracy. *United States v. Atkinson,* 15 F.3d 715, 720 (7th Cir.1994). When a district court imposes a sentence based upon information in a presentence investigation, however, a defendant must do more than merely deny the reliability or correctness of the factual allegations contained in the presentence investigation report. *Rivera,* 6 F.3d at 444. Nonetheless, the information in the presentence report supporting relevant conduct must demonstrate, at a minimum, a temporal and locational relationship among the drug transactions. *Thomas,* 969 F.2d at 355.

Mumford did not submit any evidence besides his mother's testimony during the five-hour sentencing hearing to rebut the government's evidence. The government's evidence was based on the sworn testimony of Kujawa as well as the information in the presentence report, which in turn was based on the debriefing statements of Mumford's co-defendants. These sources are sufficiently accurate and reliable evidence of the amount of cocaine involved in this case. *See Atkinson,* 15 F.3d at 720–21.

■■■ Moreover, it is acceptable for the district court to base its findings as to the quantity of drugs involved in an offense on estimation. *Duarte,* 950 F.2d at 1265. "Factual determinations under the Guidelines need not emulate the precision of Newtonian physics," although "nebulous eyeballing" is prohibited. *Id.* Thus, an estimation may be made by considering, among other factors, "the price generally obtained for the controlled substance, financial or other records, [and] similar transactions by the defendant...." U.S.S.G. § 2D1.1, Application Notes n. 12.

During the eleven months relevant to Mumford's purchase and resale of cocaine, Mumford purchased nearly $60,000 worth of cocaine. Based on this amount, at a price of $1,500 an ounce as described by witnesses, Kujawa testified that in excess of 40 ounces,

or 1000 grams, would thus remain admitted possession by Mumford. The 50% estimate of the amount kept and cut for further sale was a reasonable estimate based upon Kujawa's investigation. Also, the evidence revealed that Mumford was involved in a number of similar cocaine transactions, sales were made from Mumford's liquor store, and an admitted sixty to one hundred trips were made to Milwaukee to purchase cocaine. Mumford knew of and participated in the general distribution scheme and is responsible for the amount of drugs distributed in furtherance of the conspiracy that was known or reasonably foreseeable to him, namely the large amount he distributed or assisted in distributing. *See United States v. Franco,* 909 F.2d 1042, 1046 (7th Cir.1990). Because the information used in sentencing contains sufficient indicia of reliability, and because Kujawa's estimations are reasonable, the district court's findings are not subject to attack.

■■■ As to the reliability of the co-conspirators' statements regarding Mumford's involvement with large-scale narcotics trafficking, the sentencing court's factual findings can be supported by the testimony of a single witness who is arguably biased against the defendant. *Rivera,* 6 F.3d at 445. Here, the statements of a number of witnesses support the district court's findings. Accordingly, the district court's factual findings underlying its determination that over 500 grams of cocaine was attributable to Mumford are not clearly erroneous.

## IV.

### *Robert Springfield's Appeal.*

Robert pleaded guilty to count II, possession with intent to deliver one quarter and one eighth of an ounce of cocaine in connection with a transaction on March 7, 1992. Robert challenges the district court's sentence enhancement for possession of a gun.

Robert did not possess a weapon on March 7, 1992 during the cocaine transaction offense for which he was convicted. Boorse, however, owned a .22 caliber Luger handgun which Robert's co-defendant, Mumford, often borrowed to carry on his excursions to Milwau-

kee. Boorse corroborated the presence of a firearm by stating that he was aware that Mumford carried a handgun when he came to Milwaukee to pick up cocaine, and recalled an occasion when Mumford shot twice at a road sign from their automobile during one trip. Mumford also carried a handgun during one drug transaction in which he took the weapon out and placed it on the table before Robert to let Robert know he was carrying a firearm. Robert therefore actually knew that Mumford was armed during some of the cocaine transactions in which he was involved. Accordingly, the district court found that Robert was aware that a gun was employed in connection with the purchase, transportation, and delivery of the cocaine.

Under the October 1988 edition of the Sentencing Guidelines, a two level increase in a defendant's base offense level was appropriate "[i]f a firearm or other dangerous weapon was possessed during commission of the offense...." U.S.S.G. § 2D1.1(b)(1) (Oct. 1988). This section required that the defendant possess the weapon during the offense of conviction in order to receive the increase. *United States v. Rodriguez–Nuez*, 919 F.2d 461, 467 (7th Cir.1990).

■ Like base offense levels, adjustments are determined on the basis of the conduct for which the defendant was convicted as well as the acts and omissions which are related to the conduct for which the defendant was convicted. *United States v. Baldwin*, 5 F.3d 241, 242 (7th Cir.1993). As we noted above in relation to the quantity of drugs attributable to a defendant, relevant conduct also normally includes other acts of the defendant, as well as the reasonably foreseeable acts of others committed in furtherance of a joint criminal plan or scheme, that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(A), (B)

& (a)(2). But because the guidelines had earlier specifically contemplated that a dangerous weapon must have been possessed during the commission of the offense of conviction, the rules of relevant conduct did not apply to the dangerous weapon enhancement. *United States v. Edwards*, 940 F.2d 1061, 1064 (7th Cir.1991). Thus, if a defendant was not convicted of conspiracy, but was convicted of a single-offense narcotics transaction, the weapons enhancement could not be upheld under the theory that a co-conspirator possessed the weapon or that the weapon was earlier used in furtherance of the conspiracy, if the defendant did not possess the weapon during the offense of conviction. *Id.* at 1063; *Rodriguez–Nuez*, 919 F.2d at 467.

■ The Sentencing Commission, however, amended this guideline effective November 1991. The dangerous weapon enhancement is no longer restricted to possessions during the offense of conviction, but requires only that the defendant "possessed" the weapon. U.S.S.G. § 2D1.1(b)(1) (Nov.1993); *see United States v. Montgomery*, 14 F.3d 1189, 1198–99 n. 9 & n. 10 (7th Cir.1994); *Baldwin*, 5 F.3d at 243 n. 3; *United States v. Cantero*, 995 F.2d 1407, 1410 (7th Cir.1993). We are now called upon to decide the effect that the 1991 amendment of § 2D1.1(b)(1) has on the two level adjustment for possession of a weapon under the circumstances presented in this case. We conclude that the enhancement for weapons possession is applicable where the defendant is accountable for the possession of a weapon by a co-conspirator during drug trafficking conduct relevant to the offense of conviction, of which the defendant was charged but not convicted, even where the weapon was not present during the offense of conviction.[1]

---

1. The government did not argue that the two-level adjustment of Mumford's sentence for possession of a dangerous weapon could be affirmed on the ground that Robert was in joint, constructive possession of the gun during the transaction between Mumford and Robert where Mumford brandished the gun. This transaction is relevant conduct; and we have held in prior circumstances that § 2D1.1(b)(1) does not require the defendant to actually possess the firearm for the

provision to apply. *Cantero*, 995 F.2d at 1410 (citing *United States v. Rush*, 890 F.2d 45, 52 (7th Cir.1989)). Although the facts are not developed enough for us to reach the issue, Robert was arguably in joint, constructive possession of the weapon when Mumford placed the firearm on the table in close proximity to Robert during the drug transaction. *See, e.g., United States v. Rice*, 995 F.2d 719, 724–25 (7th Cir.1993).

The Sentencing Commission, by extracting the restriction that a dangerous weapon be possessed during the commission of the offense of conviction for the enhancement to apply, expanded the scope and applicability of the weapons enhancement. This deletion represents a conscious choice to alter the applicability of § 2D1.1(b)(1). Without this restriction in the Guidelines, the criminal defendant who pleads guilty to a single-offense narcotics transaction is now fair game for the application of the rules of relevant conduct to the weapons enhancement, even if the conspiracy count is dismissed. The Tenth and Fourth Circuits are in accord. *See United States v. Roederer,* 11 F.3d 973, 982–83 (10th Cir.1993); *United States v. Falesbork,* 5 F.3d 715, 720 (4th Cir.1993). Accordingly, district courts must no longer limit their review to the evidence dealing with the proximity of the firearm and the drugs at the specific time of the offense of conviction, *see, e.g., Cantero,* 995 F.2d at 1412, but may appropriately apply the same analysis as if the defendant were convicted of the conspiracy.

The Commission had good reason to expand the applicability of the weapons enhancement too. Except at the time of a defendant's sentencing, the presence of a gun is mutually advantageous to all involved in a narcotics conspiracy. Dealers often keep firearms in strategic proximity to their drugs or their transactions. The law recognizes the danger of weapons used in this manner and proscribes that conduct. *See* 18 U.S.C. § 924(c); *United States v. Carson,* 9 F.3d 576, 582 (7th Cir.1993). The Sentencing Guidelines also recognize this reality through the enhancement for weapons possession. This enhancement "reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1, Application Notes n. 3 (Nov. 1993).

■ Mumford packed along a firearm in this case to protect the purchase price of the narcotics transactions or to protect the transport of cash and, later, cocaine. Robert shared in the sense of security occasioned by the presence of a gun during the sale of the cocaine and could confidently assume that their common scheme to distribute narcotics would enjoy a protracted existence guarded by the gun. Firearms thus commonly and foreseeably facilitate narcotics purchases, transportations, and deliveries, and increase the threat of violence.

In this case, the evidence shows that the defendants engaged in a longstanding scheme to distribute cocaine from Milwaukee to the Wausau area. Accordingly, Mumford's possession of a dangerous weapon that was reasonably foreseeable to Robert and in furtherance of the jointly undertaken criminal activity of Robert, Christopher, and Mumford, and which was part of the same course of conduct or common scheme as the offense of conviction for Robert, was properly used as a basis for the two level enhancement of the base offense level. *United States v. Johnson,* 997 F.2d 248, 256–57 (7th Cir.1993). Here, it is not clearly improbable that the weapon was connected with drug trafficking; rather, the gun was brandished during at least one transaction and accompanied Mumford on four occasions known to Robert. The district court's finding that Robert possessed a weapon was therefore not clearly erroneous.

## V.

### *Christopher Springfield's Appeal.*

Christopher pleaded guilty to count V, possession of cocaine with intent to distribute and distribution of cocaine, for his involvement with a transaction on August 15, 1992. Christopher challenges both the amount of cocaine the district court attributed to him and the two level upward departure for possession of a gun.

■ The above discussion makes easier the disposition of Christopher's arguments on appeal. In Christopher's case, there exists sufficient evidence to sustain the district court's ruling that over 500 grams of cocaine was attributable to him. Kujawa attributed about 1500 grams of cocaine to Christopher based on his estimate that Robert, the source of the cocaine, had supplied over 1500 grams of cocaine to the others during the course of the narcotics scheme and his belief that Christopher was aware of all the drug-related activities of his brother that took place in Milwaukee. Christopher frequently made

phone calls to arrange the various deals with Robert and was involved in a number of sales personally. Kujawa testified that Mumford referred to Christopher as similar to "a line supervisor in a factory" because everyone "needed [his] permission to do anything." The district judge thus found that Christopher was "totally involved" in the drug transactions. In light of the evidence in the record, this finding is fully corroborated and is not clearly erroneous.

 Furthermore, the court correctly applied a two level enhancement for possession of a gun. The district court imposed the two level adjustment because Christopher actually possessed a firearm during relevant conduct. According to the presentence investigation reports, Christopher had carried a 12-gauge shotgun to Milwaukee on some of the trips that he and Mumford had made to purchase cocaine from Robert. Christopher had obtained the shotgun from Heisler in satisfaction of a prior cocaine debt. It was not clearly erroneous for the district court to rely upon the information contained in the presentence investigation reports to conclude that a weapon was possessed during certain of Christopher's drug transactions that were part of the same narcotics trafficking scheme as that of the offense of conviction. As we determined above, the information forming the basis of the defendants' sentences contained a sufficient indicia of reliability to support the district court's findings. Christopher did not mount any attempt to attack the reliability of the information contained in his presentence report. His sentence is therefore affirmed.

### VI.

We AFFIRM the sentences of Brett Mumford, Robert Springfield, and Christopher Springfield.