In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3287

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFERY DEAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:06-cr-0023-SEB-MGN-14—**Sarah Evans Barker**, *Judge.*

ARGUED MAY 27, 2009—DECIDED JULY 31, 2009

Before CUDAHY, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After an extensive investigation of a large drug distribution organization, the Government charged Jeffery Dean and several other individuals with conspiring to distribute and to possess with intent to distribute methamphetamine. A jury found Mr. Dean guilty of the conspiracy, and the district court sentenced him to 156 months' imprisonment. Mr. Dean now appeals. He claims that the evidence presented at trial was

insufficient to support the jury's verdict, resulting in a fatal variance between the crime charged and the offense proved at trial. He also challenges the court's determination of his base offense level and its application of a two-level enhancement for obstruction of justice. For the reasons set forth below, we affirm Mr. Dean's conviction, vacate his sentence and remand his case for resentencing in accordance with this opinion.

# I

## BACKGROUND

### A.  The Facts Presented at Trial and Mr. Dean's Conviction

In 2007, a grand jury returned a multi-count indictment against Mr. Dean and several other individuals who allegedly had participated in a drug distribution organization. In Count I of the indictment, Mr. Dean was charged with conspiring to possess with intent to distribute and conspiring to distribute methamphetamine. Mr. Dean pleaded not guilty to the charged conspiracy.

At trial, the Government presented evidence of the organization and operation of a large conspiracy engaged in distributing methamphetamine and other drugs in several states. Special Agent Arnold Fitzgerald, who was involved in the investigation, testified that the leader of the conspiracy's Indiana operations was a man named Francisco Ortuno-Vasquez. Ortuno-Vasquez received large quantities of methamphetamine and other drugs on a weekly basis; he would then deliver the drugs to

distributors in Indiana and Kentucky. One distributor, Josefina Reballor, was in frequent contact with Ortuno-Vasquez and regularly received pound quantities of methamphetamine from him. R.78 at 154. Reballor lived with her brother-in-law, Aaron Unger, who delivered drugs and collected money on Reballor's behalf. Agent Fitzgerald testified that another indicted coconspirator, Todd Sipe, admitted to being present on two or three occasions when Unger met Mr. Dean to exchange either methamphetamine or money. According to Agent Fitzgerald, Sipe also admitted that he had received methamphetamine from Mr. Dean. R.78 at 193-94, 197-98.

Agent Fitzgerald further testified that, during a search of Unger and Reballor's residence, law enforcement officers found an index card in Unger's room; the card listed the name "Speedy," two dates and several numbers. Agent Fitzgerald explained that the index card was a ledger used to record a drug debt. According to the ledger, Speedy had received twelve ounces of methamphetamine and owed Unger $29,850; on September 1, 2006, Speedy made a payment of $13,000, reducing the amount owed to $16,850. During the same search of Unger and Reballor's residence, investigators found and seized a phone belonging to Unger. Mr. Dean's phone number was stored in the phone's memory under the name "Speedy."

Next, the Government called Unger, who testified about Mr. Dean's involvement in the conspiracy. Unger acknowledged that he and Reballor lived in the residence where the ledger and phone were found. He stated that Reballor

paid him a thousand dollars a week to deliver drugs and to collect money on her behalf. Unger identified Mr. Dean as one of Reballor's customers and indicated that he knew Mr. Dean by the name "Speedy." Unger further testified that, beginning in the summer of 2006 and ending in November 2006,[1] he would deliver about twelve ounces of methamphetamine per week to Mr. Dean at one of two locations. He stated that he would "front" the drugs to Mr. Dean; in other words, he explained, he would deliver a quantity of drugs to Mr. Dean, and Mr. Dean would pay him for those drugs at a later date. Unger identified the index card found at his residence as a record of Mr. Dean's $29,850 drug debt and his partial payment of that debt on September 1. Unger also identified the phone seized by law enforcement officers as his own; he also verified that Mr. Dean's phone number was stored in the phone's memory under the name "Speedy." In addition, he stated that text messages sent from Mr. Dean's number and stored in his phone's memory were references to methamphetamine transactions with Mr. Dean.[2] In response to the Government's

---

[1] Later, Special Agent Mark Slaughter testified that he debriefed Unger after his arrest. At the debriefing, Unger indicated that he began delivering drugs for Reballor in September 2006.

[2] The text messages, which were sent in November 2006, read as follows: "The ex just showed up. We're going to do something tomorrow no matter what." R.78 at 186. "Should be pretty soon." *Id.* "On my way. You good?" *Id.* "I'm here." *Id.*

(continued...)

estimation that he had delivered thirteen or fourteen pounds of methamphetamine to Mr. Dean, Unger replied "probably." R.78 at 248.

Corporal Brad Jones testified about a conversation he had with Mr. Dean on November 24, 2006. He stated that, during that conversation, he had asked Mr. Dean whether he was involved in the distribution of illegal drugs. Mr. Dean responded that, at one time, he had been involved with a large Mexican drug organization. He also admitted that he owed more than $80,000 to that organization. On one occasion, Mr. Dean stated, a dealer carrying ten pounds of methamphetamine had come to his residence; he had received one pound of methamphetamine from the dealer. Mr. Dean also told Corporal Jones that, in the weeks preceding their meeting, he had obtained and sold an ounce of methamphetamine.

After the Government rested its case, Mr. Dean testified in his own defense. Although he could not remember the details of the November 24 conversation with Corporal Jones, and, therefore, could not directly refute Corporal Jones' testimony, Mr. Dean did state that he never distributed methamphetamine.[3] He further testified that he

---

[2] (...continued)
at 187. "What's up?" *Id.* "Hello." *Id.* "Van wouldn't start on the way." *Id.* "It was 5.5 short." *Id.* "Did you get that?" *Id.*

[3] At one point, Mr. Dean was asked what he did with the methamphetamine he purchased from Unger, and Mr. Dean replied "I would deal 'em." R.78 at 284. Neither party consid-

(continued...)

was highly tolerant of the drug and used over three grams of methamphetamine per day. He stated that, in August or September 2006, he began purchasing one-ounce quantities of methamphetamine from Unger;[4] he denied having received one-pound quantities of methamphetamine.

Crystal Robins, Mr. Dean's girlfriend, corroborated Mr. Dean's testimony: She stated that Mr. Dean was addicted to methamphetamine and that his addiction was severe. Robins asserted that Mr. Dean used, but did not sell, methamphetamine. She admitted, however, that Mr. Dean could have kept his drug dealing a secret from her. Robins also testified that, prior to 2004, she had received methamphetamine from Mr. Dean.

At the conclusion of the evidence, the parties rested their cases, and Mr. Dean renewed his motion for a directed verdict.[5] The court instructed the jury that, to find Mr. Dean guilty of the crime charged, it must conclude beyond a reasonable doubt that "a conspiracy existed to possess with the intent to distribute and to distribute methamphetamine," and that Mr. Dean "knowingly

---

[3] (...continued)
ered this inconsistency in testimony as significant enough to mention, so we will treat this testimony as a misstatement.

[4] According to Mr. Dean, prior to August 2006, he purchased methamphetamine from a man named Billy.

[5] The district court took this motion under advisement and stated that it would rule after closing arguments, but the appellate record does not contain the court's ruling.

became a member of the conspiracy with an intention to further it." R.43 at 20. The court further instructed the jury that, when determining whether a conspiracy existed, it could consider, among other things, "whether the parties had a standardized way of doing business over time" and "whether the sales were on credit or consignment." *Id.* at 25. After deliberation, the jury returned a guilty verdict against Mr. Dean. In a special finding, the jury found that the weight of the methamphetamine was less than 500 grams.

## B.  Sentencing Proceedings

At the sentencing hearing, Mr. Dean objected to the computation of his base offense level in the presentence report ("PSR"). According to the PSR, Mr. Dean was fully aware that the conspiracy involved the distribution of more than 150 kilograms of methamphetamine, an amount that corresponds to a base offense level of 38. Mr. Dean noted that the jury found him responsible for no more than 500 grams of methamphetamine, and he urged the court to apply a lower base offense level. The court overruled the objection and allowed the offense level to stand at 38, concluding that "38 is a reliable estimate of the amount of methamphetamine that was being dealt by the members of the conspiracy, including Unger and Sipe." R.77 at 38. The court then indicated that it later would apply a downward adjustment "to take into account the fact that it was probably not all foreseeable to Mr. Dean, and in any event, his involvement was less and the jury has concluded that it

was less . . . by attributing to him the 500 grams amount." *Id.*

Mr. Dean also objected to the PSR's recommendation that a two-level obstruction of justice enhancement be applied. The court applied the enhancement, concluding that Mr. Dean unequivocally obstructed justice when he stated, under oath, that he had never sold methamphetamine. *Id*. at 28. After applying the two-level obstruction enhancement, the court applied a two-level reduction based on its conclusion that Mr. Dean was a minor participant in the conspiracy, resulting in an adjusted offense level of 38. *Id.* at 67.

Next, the court acknowledged that Mr. Dean's base offense level "[took] into account the full scope of . . . the amount [of drugs] involved in the conspiracy." *Id.* at 68. It further recognized that the jury found Mr. Dean responsible for less than 500 grams of methamphetamine. In consideration of the jury's finding, the court applied a four-level reduction, thereby "split[ting] the difference" between the base offense level for all the drugs in the conspiracy and the highest offense level that it believed to be supported by the jury's verdict. *Id.* at 68-69.[6] The

---

[6] The district court said:

> I promised that I would take into account the fact that the jury determined that the government had proven beyond a reasonable doubt that the conspiracy of which you were found guilty was no more than 500 grams of methamphetamine. So we started out, the offense level with the full
> (continued...)

court then applied a one-level reduction in recognition of the fact that Mr. Dean's addiction, not greed, was the driving force behind his participation in the offense. The court also stated that it accepted the PSR as circulated "[i]n all the respects that [had] not been addressed and otherwise ruled upon by the court." *Id.* at 40. Thus, Mr. Dean's adjusted offense level was set at 33, and his criminal history category was II. The court sentenced Mr. Dean to 156 months' imprisonment, a sentence at the lower end of the recommended sentencing range.

---

[6] (...continued)

amount of the conspiracy equating to a 38 offense level. I'm sorry this is so technical, but the lawyers will understand.

We started out with the offense level of 38 which takes into account the full scope of the conspiracy drugs and the amount involved in the conspiracy. But if you look in the guidelines to find the guideline range that equates to the 500 grams, it's a level 30. And so in an effort to take into account those two factors, I'll split the difference, and allow a four-level reduction.

Let me make sure you understand. We started with a 38. The 500 level would equal an offense level of 30. And so I will cut that in half in terms of the offense level, and allow a four-level reduction to take into account the jury's verdict and the distinction the jury made with respect to the government's proof.

I want to repeat here that the Court is not bound by the jury's decision, but it seems fair to me. It seems reasonable to me to make an adjustment in light of their finding.

R.77 at 68-69.

## II

## DISCUSSION

Mr. Dean raises three arguments on appeal: First, he claims that there is an impermissible variance between the crime charged in the indictment and the evidence presented at trial. Second, he challenges the district court's determination of the applicable base offense level. Third, he asserts that the district court erred when it applied a two-level enhancement for obstruction of justice. We shall address each of these arguments in turn.

## A.

Mr. Dean submits that there is a fatal variance between the crime charged in the indictment and the evidence presented at trial. A variance occurs "when the facts proved at trial differ from those alleged in the indictment." *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009) (citing *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007)). To prevail on his variance claim, Mr. Dean must show both (1) that the evidence presented at trial did not support the jury's finding that he joined the charged conspiracy and (2) that he was prejudiced by the variance. *See id.* Thus, we treat Mr. Dean's variance claim as a challenge to the sufficiency of the evidence. *See id.*; *United States v. Messino*, 382 F.3d 704, 709 (7th Cir. 2004). When reviewing such a challenge, we view the evidence presented at trial and draw all reasonable inferences from that evidence in the light most favorable to the Government. *United States v. Adkins*, 274 F.3d 444, 449 (7th Cir.

2001). We shall "overturn a conviction only if the record contains no evidence from which a reasonable juror could have found the defendant guilty." *Longstreet*, 567 F.3d at 918.

Applying this standard, we look to the record to determine whether, given the evidence presented at trial, any reasonable jury could have concluded that the Government had proven each element of the crime charged beyond a reasonable doubt. *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984). To support Mr. Dean's conviction for conspiracy under 21 U.S.C. § 846, the Government was required to show that (1) two or more individuals agreed to commit an unlawful act—in this case, distribution of methamphetamine and possession with intent to distribute it—and (2) Mr. Dean knowingly and intentionally joined the agreement. *See United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006).

Mr. Dean does not deny the existence of the conspiracy; instead, he contends that he merely purchased methamphetamine for his own personal use and, therefore, never joined the conspiracy. *See id.* ("Evidence that the defendant was in a mere buyer-seller relationship with the alleged coconspirator is insufficient to establish a conspiracy." (citation omitted)). He claims that the Government presented no reliable evidence supporting the conclusion that Unger assisted Mr. Dean with the sale of methamphetamine or otherwise had any interest in what Mr. Dean did with his drugs after he received them. To support this contention, Mr. Dean asks us to ignore Unger's testimony and Sipe's statement to Agent Fitzger-

ald; he maintains that the jury necessarily rejected this evidence when it found that Mr. Dean was responsible for less than 500 grams of methamphetamine. He further points out that Sipe may have been biased against him.

By raising these arguments, Mr. Dean invites us to re-weigh the evidence and inquire into the jury's thought process; this we cannot do. In the absence of truly exceptional circumstances, we shall not second-guess the jury's credibility determinations.[7] Mr. Dean has pointed to no exceptional circumstances that would justify disturbing the jury's credibility findings. Furthermore, Mr. Dean's claim that the jury necessarily discredited Unger's and Sipe's statements is pure speculation. The jury's conclusion that Mr. Dean was responsible for less than 500 grams of methamphetamine could be the product of a mistake, compromise or leniency, rather than an indication that the jury disbelieved Unger's and Sipe's statements in their entirety. *United States v. Nobles*, 69 F.3d 172, 189 (7th Cir. 1995) (rejecting the defendant's argument that a split verdict demonstrated that the

---

[7] *See United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) ("We will not upset the jury's credibility determination unless 'exceptional circumstances' exist; that is, it was 'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" (quoting *United States v. Smith*, 393 F.3d 717, 719 (7th Cir. 2004))).

evidence was insufficient to support his conviction).[8] We shall not inquire into the jury's thought processes; instead, we "defer to the jury's 'collective judgment'" and shall not disturb its verdict based on Mr. Dean's speculative arguments. *Id.* (quoting *United States v. Lakich*, 23 F.3d 1203, 1212 (7th Cir. 1994)).

After reviewing the transcript of the trial proceedings and the evidence presented at trial, we are convinced that the Government introduced sufficient evidence from which a reasonable jury could find that Mr. Dean intentionally joined the charged conspiracy. First, Unger testified that he routinely fronted methamphetamine to Mr. Dean. The index card found in Unger's home, which recorded Mr. Dean's methamphetamine purchase and corresponding indebtedness, supported Unger's testimony. The evidence that Unger repeatedly provided Mr. Dean with large quantities of methamphetamine on credit, if accepted by the jury, could suggest that Unger both knew that Mr. Dean would resell the methamphetamine and had a financial interest in the resale.[9] For this

---

[8]  *See also United States v. McGee*, 189 F.3d 626, 630 (7th Cir. 1999) ("We cannot accept Mr. McGee's contention that [the witnesses'] testimony is entitled to no weight just because the jury acquitted Mr. McGee of Count 2. We cannot know, nor is it our place to speculate, whether the jury decided to acquit Mr. McGee of Count 2 because it found the witnesses incredible or for some other reason.").

[9]  *See United States v. Adkins*, 274 F.3d 444, 450 (7th Cir. 2001) ("The fact that the drugs Adkins supplied to Hummel and Tyner

(continued...)

reason, the evidence of fronting alone may be sufficient to support Mr. Dean's conviction. *See United States v. Stott*, 245 F.3d 890, 903 (7th Cir. 2001) (recognizing that " '[t]he repeated 'fronting' of [drugs], alone, has been held sufficient to support the jury's conclusion that the defendant had knowingly joined a distribution conspiracy.' " (alteration in original) (quoting *United States v. Ferguson*, 35 F.3d 327, 331 (7th Cir. 1994))).

In addition, the Government introduced evidence that Mr. Dean purchased large, standardized quantities of methamphetamine at regular intervals over an extended period of time. Unger testified that, over the course of several months, he would deliver twelve ounces of methamphetamine to Mr. Dean on a weekly basis; these deliveries always were made at one of two locations. This evidence lends support to the jury's finding that Mr. Dean was a participant in the conspiracy.[10] As Mr. Dean correctly

---

[9]  (...continued)

were in such large quantities and were often sold partially on credit suggested that Adkins not only knew that Hummel and Tyner would resell the drugs, but also depended on the resales in order to get paid.").

[10] *See id*. at 450-51 (concluding that the evidence could support the jury's verdict where the Government introduced, among other things, evidence of the defendant's standardized dealings with coconspirators, the length of the defendant's involvement, and the quantities of drugs involved); *United States v. Hach*, 162 F.3d 937, 943-44 (7th Cir. 1998) (noting that the evidence of routine deliveries established a "demonstrated

(continued...)

notes, standardized transactions do not, by themselves, transform a customer into a coconspirator. *United States v. Colon*, 549 F.3d 565, 567 (7th Cir. 2008). In this case, however, Mr. Dean's involvement as a coconspirator is also supported by the evidence that Sipe saw Mr. Dean purchase methamphetamine from Unger on two or three occasions and by Sipe's admission that he obtained meth-amphetamine from Mr. Dean. It is also bolstered by Mr. Dean's November 24, 2006 discussion with Corporal Jones, in which Mr. Dean admitted obtaining and selling an ounce of methamphetamine in the weeks preceding their meeting. Furthermore, as we mentioned earlier, it is supported by Unger's claim that he fronted metham-phetamine to Mr. Dean.[11]

In sum, we conclude that the evidence is sufficient to support the jury's verdict. The Government presented evidence that Unger fronted large, standardized quantities

---

[10] (...continued)
level of mutual trust," and concluding that the evidence presented supported the jury's verdict).

[11] *Compare Hach*, 162 F.3d at 943 (concluding that the parties' frequent, repeated transactions, together with the "attendant established method of payment that include[d] a rudimentary form of credit," could support the conspiracy conviction), *with United States v. Colon*, 549 F.3d 565, 568 (7th Cir. 2008) (noting that the evidence that the defendant regularly engaged in standardized transactions was insufficient to support the defendant's conspiracy conviction in the absence of "sales on credit to the defendant, or other evidence of mutual trust or dependence").

of methamphetamine to Mr. Dean on a regular basis, and it introduced testimony demonstrating that Mr. Dean redistributed at least some of this methamphetamine to others. The jury could have concluded, based on this evidence, that Mr. Dean knowingly and intentionally joined the conspiracy. Therefore, Mr. Dean cannot show that the evidence presented at trial did not support the jury's finding, and his variance claim must fail.[12]

**B.**

We now turn to Mr. Dean's challenges to the sentence imposed by the district court. Mr. Dean first contends that the district court incorrectly calculated his sentencing range. Second, he submits that the district court erred in applying a two-level obstruction of justice enhancement. We review the district court's interpretation of the Sentencing Guidelines de novo, and we review its factual findings for clear error. *United States v. Mumford*, 25 F.3d 461, 465 (7th Cir. 1994) (citing *United States v. Lozoya-Morales*, 931 F.2d 1216, 1218 (7th Cir. 1991)).

**1.**

"A defendant's base offense level for a narcotics offense is defined primarily by the amount of drugs attributable to

---

[12] Because Mr. Dean has failed to demonstrate that a variance occurred in this case, we need not address whether he was prejudiced by the alleged variance.

[the defendant]." *Mumford*, 25 F.3d at 465; *see* U.S.S.G.
§ 2D1.1. The Government bears the burden of proving
the quantity of drugs attributable to the defendant by a
preponderance of the evidence. *United States v. Soto-Piedra*,
525 F.3d 527, 529 (7th Cir. 2008). In determining a defen-
dant's base offense level, a court must consider both the
acts giving rise to the conviction and any relevant con-
duct. *Mumford*, 25 F.3d at 465. In the case of a jointly
undertaken criminal activity, relevant conduct includes
the foreseeable acts and omissions of other participants
in the criminal enterprise. *Soto-Piedra*, 525 F.3d at 531
(quoting U.S.S.G. § 1B1.3(a)(1)(B)). However, for sen-
tencing purposes, a defendant convicted of conspiracy is
not automatically liable for the acts of his coconspirators;
a defendant may be held liable only for those acts or
omissions that were both made in furtherance of the
conspiracy and foreseeable to the defendant. *Id.* at 531-32
(quoting *United States v. Edwards*, 115 F.3d 1322, 1327 (7th
Cir. 1997)). Therefore, the "[a]ctions of coconspirators
that a particular defendant does not assist or agree to
promote are generally not within the scope of that defen-
dant's jointly undertaken activity." *Id.* at 533 (citing
U.S.S.G. § 1B1.3 cmt. n.2).

Although the district court is not bound by the Guide-
lines in sentencing a defendant, it is required to calculate,
in the course of arriving at the sentence, the appropriate
guidelines sentencing range. *United States v. Laufle*, 433
F.3d 981, 985 (7th Cir. 2006). The first step in that calcula-
tion is to ascertain the correct base offense level. After
reviewing the sentencing transcript, we must conclude that
the district court never undertook that essential first step

by ascertaining the quantity of methamphetamine reasonably foreseeable to Mr. Dean. The district court set Mr. Dean's base offense level at 38, noting that "38 is a reliable estimate of the amount of methamphetamine that was being dealt by the members of [the] conspiracy, including Unger and Sipe."[13] R.77 at 38. The court did not, however, determine that the entire quantity of methamphetamine distributed by the conspiracy was reasonably foreseeable to Mr. Dean. In fact, the court found the opposite to be true: After setting the base offense level at 38, the court stated that it would

> adjust downward from that when [it made] a sentencing decision to take into account the fact that it was probably not all foreseeable to Mr. Dean, and in any event, his involvement was less and the jury concluded that it was less . . . by attributing to him the 500 grams amount.

*Id.* The court later said that it would "split the difference" by allowing a four-level reduction in the offense level. *Id.* at 68-69.

We cannot accept this approach as the equivalent of a judicial determination of the amount of drugs—and therefore the appropriate offense level—properly attributable to Mr. Dean. It is clear from the court's statements that it had determined that Mr. Dean should not be

---

[13] Earlier in the sentencing hearing, the court noted, and Mr. Dean agreed, that this offense level corresponded to fifteen kilograms or more of methamphetamine. R.77 at 33; *see* U.S.S.G. § 2D1.1(c).

held accountable for the entire amount of drugs in the conspiracy.[14] Yet, it does not appear that the court ever actually determined the amount that ought to be attributed to him. We are aware of the difficulties inherent in ascertaining the amount of drugs attributable to an individual.[15] Our case law makes clear that this is a task

---

[14] The district court did state that "[i]n all the respects that have not been addressed and otherwise ruled upon by the Court, I accept the presentence investigation report as drafted and submitted and circulated by Mr. Schoettmer, and we'll use this formulation as my own for making the sentencing decisions that remain." R.77 at 40. Although the PSR did indicate that the entire quantity of methamphetamine distributed by the conspiracy was foreseeable to Mr. Dean, the court concluded otherwise. After an extensive discussion about the appropriate base offense level and the scope of the conspiracy, the court specifically stated that the amount of methamphetamine distributed "was probably not all foreseeable to Mr. Dean." *Id.* at 38. Because this language is at odds with the finding in the PSR, we do not believe that the court adopted the PSR's conclusion with respect to the foreseeability issue.

[15] *See United States v. DePriest*, 6 F.3d 1201, 1212 (7th Cir. 1993) ("Discerning exactly how much of the total drug quantity distributed through a conspiracy should have been reasonably foreseeable to a co-conspirator has often proved difficult."); *see also, e.g., United States v. Bautista,* 532 F.3d 667, 672 (7th Cir. 2008) (noting that courts may approximate the quantity of the controlled substance "'[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense'" (alterations in original) (quoting U.S.S.G. § 2D1.1 cmt. n.12)); *United*

(continued...)

that can be accomplished by reasonable approximation. *United States v. Krasinski*, 545 F.3d 546, 552 (7th Cir. 2008); *see also* U.S.S.G. § 2D1.1 cmt. n.12. However, our cases also have said that mere "eyeballing" of the amount is not sufficient. *United States v. Cox*, 536 F.3d 723, 729 (7th Cir. 2008).

The district court did not make an adequate finding of the quantity of methamphetamine reasonably foreseeable to Mr. Dean. "Although a district court's findings of relevant conduct are reviewed only for clear error, even such deference cannot cure an absence of findings on key elements of the analysis." *United States v. Fox*, 548 F.3d 523, 532 (7th Cir. 2008) (citations omitted).[16] In a

---

[15] (...continued)
*States v. Hollins*, 498 F.3d 622, 631-32 (7th Cir. 2007) (discussing the determination of the quantity of drugs smuggled into the United States when the drugs were not intercepted on one occasion); *United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000) (analyzing the calculation of the quantity of drugs based on the regular receipt of drugs by the defendant's employee); *United States v. Pigee*, 197 F.3d 879, 890 (7th Cir. 1999) (evaluating whether certain transactions were reasonably foreseeable to the defendants where the defendants were not present during those transactions).

[16] In *United States v. Fox*, 548 F.3d 523, 531-33 (7th Cir. 2008), we vacated and remanded the defendant's case for resentencing, noting that, although the district court did consider whether the coconspirator's possession of forty grams of crack cocaine was foreseeable to the defendant, it did not consider "whether

(continued...)

conspiracy case, the foreseeability of the quantity of drugs is a "crucial element in determining the proper base offense level." *United States v. Goines*, 988 F.2d 750, 776-77 (7th Cir. 1993) (vacating and remanding Goines' sentence where the district court, "[b]y setting the base offense level in relation to the amount of cocaine involved in the conspiracy, . . . failed to make a specific finding of the quantity reasonably foreseeable to Goines"). We therefore must vacate Mr. Dean's sentence and remand this case to the district court so that it may make a specific finding as to the quantity of methamphetamine reasonably foreseeable to Mr. Dean and, on the basis of that finding, impose the correct sentence.

**2.**

The court need not, however, revisit the obstruction of justice issue on remand. The district court acted well within its discretion in applying that enhancement. Contrary to Mr. Dean's assertions, the district court did not base its application of the enhancement "on [the] assumption that in finding Mr. Dean guilty of conspiracy, the jury must have rejected the buyer/seller defense and found that Mr. Dean had sold methamphetamine." Appellant's Br. 43. Instead, the court noted that Mr. Dean unequivocally stated in his sworn testimony that he never had sold methamphetamine. R.77 at 28. The court charac-

---

[16] (...continued)
that awareness arose out of [the defendant's] joint criminal activity with [the coconspirator]."

terized this statement as "an obstruction" and permitted the enhancement. *Id.* It is clear from the transcript that the court specifically found that Mr. Dean had " 'willfully made misrepresentations under oath that were relevant to the prosecution' " with the specific intent of obstructing justice; this finding was sufficient to support the obstruction enhancement. *United States v. Bryant*, 557 F.3d 489, 501 (7th Cir. 2009) (quoting *United States v. Carroll*, 412 F.3d 787, 793 (7th Cir. 2005)); *United States v. Bermea-Boone*, 563 F.3d 621, 626-27 (7th Cir. 2009) ("It is well-settled that perjury is an example of conduct that warrants an enhancement for obstruction of justice.").

## Conclusion

In sum, we hold that the evidence presented at trial was sufficient to support the jury's verdict. Furthermore, we conclude that the district court did not abuse its discretion by applying an obstruction of justice enhancement. Nevertheless, we must vacate Mr. Dean's sentence and remand for further proceedings so that the district court may determine the quantity of methamphetamine that was reasonably foreseeable to Mr. Dean.

AFFIRMED in part, VACATED and REMANDED in part